UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CR-11-TS |
| | ) | |
| JAMARCUS A. TUCKER | ) | |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion to Suppress [DE 23], filed on February 4, 2005. For the reasons stated herein, the Defendant's Motion is denied.

**BACKGROUND**

The Defendant, Jamarcus A. Tucker, is charged with violating 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm, and 21 U.S.C. § 844, possessing less than five grams of cocaine base "crack." On February 4, 2005, the Defendant moved to suppress all evidence seized when he was stopped, arrested, and searched by Fort Wayne Police Officers on January 2, 2005. The Defendant maintains that the search and seizure were unlawful because the police acted without reasonable suspicion that the Defendant or the friends who were with him were violating any laws. He contends that any evidence seized, or any statements he made, after his arrest should be excluded as fruits of the poisonous tree.

The government opposed the motion, and an evidentiary hearing was held on March 17, 2005. The Defendant was present and represented by attorney Thomas O'Malley. The government was represented by Assistant United States Attorney Lovita Morris King. At the conclusion of the hearing, the Court took the motion under advisement and the parties were given additional time to

file briefs.

On May 9, 2005, the government filed its post-hearing brief in opposition to the Defendant's motion to suppress evidence. On May 26, the Defendant responded to the government's brief. On June 7, the government replied.

**FINDINGS OF FACT**

After considering the evidence submitted at the hearing and the credibility of the witnesses, the Court makes the following findings of fact:

On January 2, 2005, at about 9:00 p.m., Officer Corey Thomas of the Fort Wayne Police Department was dispatched to 2614 Reed Street, in the Southeast quadrant of Fort Wayne, Indiana. Officer Thomas was responding to a call that suspicious persons were on the porch of the abandoned house at 2614 Reed Street, possibly selling drugs. Officer Thomas patrolled this area of Fort Wayne and was familiar with. He knew it to be a high crime area.

It took Officer Thomas less than one minute to get to the 2600 block of Reed Street after he received the dispatch. It was dark outside, but street lights provided some light. When he turned onto the street in his marked squad car, he saw two males and a female stepping off the porch at 2614 Reed Street, which was only three or four houses away. He saw a fourth male walking on the sidewalk toward the other three.[1] Officer Thomas saw that the house had no curtains or lights and looked run down. He concluded that the house was abandoned. In his experience, when people are

---

[1] At the suppression hearing, the fourth individual, who is the Defendant's brother, Brandon Tucker (Tucker), testified that he never saw the Defendant on the porch. He stated that he was on the sidewalk at all times. The Court does not find the testimony of Tucker credible. Tucker, who has an arrest for false reporting, has an interest in trying to help his brother. Therefore, the Court does not credit his account, which directly contradicts that of Officer Thomas.

2

at an abandoned house, they are often engaged in criminal activity, such as burglary, loitering, drug dealing, or drug use. Officer Thomas asked the individuals, who he later learned were Defendant Jamarcus Tucker, Terrell Hooker, and Tanisha Royal, what they were doing. Someone responded, "nothing." Officer Thomas would also learn that the fourth male, who by this time had joined the group, was Brandon Tucker, the Defendant's brother.

    Officer Thomas then asked for identification from the individuals so he could run warrant checks. He verified that none of the individuals lived at 2614 Reed Street. The Defendant had a state identification card and the others, who did not have any form of identification, told Officer Thomas their names, addresses, and dates of birth. By this time, Officer Benjamin Springer had arrived in his squad car. Officer Thomas told Officer Springer that he wanted to run warrant checks on the individuals. Officer Springer remained outside to make sure the individuals did not walk away or draw a weapon while Officer Thomas ran the checks on the computer in his squad car.

    The check on the Defendant revealed that he had no active warrants, but had a criminal history involving drugs and firearms. Concerned that the Defendant could be armed—given Officer Thomas's suspicion that narcotics might be involved, combined with the Defendant's previous criminal activity—Officer Thomas went back outside so that Officer Springer would not be alone with the Defendant and his three companions. Officer Thomas wanted to conduct a pat-down searches for weapons on all the individuals.

    When he patted the Defendant's outer clothing, Officer Thomas felt what he believed to be a Glock pistol magazine in the Defendant's jacket pocket. Officer Thomas was familiar with the Glock magazine because he carries a Glock pistol, which he unloads every night and reloads every morning. Officer Thomas estimated that this pat-down occurred about five minutes after he first

3

arrived at the Reed Street address.

Officer Thomas advised the Defendant that he was going to handcuff him for officer safety, but that he was not under arrest. The Defendant pushed away from Officer Thomas and ran. Officer Thomas chased him, as did Officer Springer. During his pursuit, Officer Thomas saw a gun magazine fall from the Defendant's left jacket pocket. He also saw the Defendant reach into the front of his pants. He then saw a handgun in the Defendant's hand as he was running and pumping his arms up by his head. During the chase, Officer Thomas heard the gun hit the pavement. After about one and one-half blocks, Officer Thomas caught the Defendant when he tried to climb a fence and, after a struggle, subdued him with the help of Officer Springer.

The Defendant was arrested and searched incident to arrest. Officers recovered crack cocaine in the Defendant's front pant pocket. Officers also recovered a loaded Glock pistol in the area where Officer Thomas heard it fall. No magazine was recovered. Officer Thomas also never found his flashlight, which fell from his back pocket during his foot pursuit. Officer Thomas attributed this to the fact that other individuals were in the area and in fact, were chasing the officers and yelling at them as they pursued the Defendant.

**CONCLUSIONS OF LAW**

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, not all encounters between the police and citizens implicate the Fourth Amendment's prohibition against unreasonable searches and seizures. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). The Seventh Circuit has recognized three categories of police-citizen encounters:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*Id.* at 836 (citing *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (citation omitted)).

**A. Initial Stop**

Here, the encounter began as an investigatory stop. Thus, under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the police officers were authorized to detain the Defendant if they had reasonable suspicion based on articulable facts that a crime was about to be or had been committed. Officers may not rely on a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations omitted). When determining whether an officer's suspicion of criminal activity was reasonable, a court evaluates the "totality of circumstances, as they appeared to the officer at the time of the stop." *United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

The Defendant argues that the anonymous tip lacked sufficient indicia of reliability to establish reasonable suspicion for a *Terry* stop. The Defendant cites *Florida v. J.L.*, 529 U.S. 266 (2000), which held that an anonymous tip must bear standard indicia of reliability to justify a *Terry*

5

stop. *Cf. Alabama v. White*, 496 U.S. 325, 327 (1990) (finding that a suitably corroborated anonymous tip may justify a *Terry* stop). In *J.L.*, an anonymous tip that a person was carrying a gun, without more, was not sufficient to justify an officer's stop and frisk of that person. *Id*. at 270–71.

The Court agrees that the tip in this case did not exhibit a sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop. That is because the tip must be reliable not on in its tendency to identify a determinate person, but in its assertion of illegality. *J.L.*, 529 U.S. at 271. In *J.L.*, the police had only the report of an unknown caller who adequately described J.L. and his location, but neither explained how he knew about the gun or supplied any basis for believing he had inside information about J.L. *Id.* Likewise, the tipster in this case did not demonstrate any knowledge of the Defendant's or his companions' criminal activity.

However, *J.L.* does not control this case. Unlike the officers in *J.L.*, Officer Thomas was not acting solely on the basis of an anonymous tip. Rather, his own observations led him to question the Defendant and his friends. In *J.L.*, "[a]part from the tip, the officers had no reason to suspect [the defendant] of illegal activity." 529 U.S. at 268.; *see also id*. at 270 ("In the instant case, the officer's suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller."). Here, in contrast, Officer Thomas saw, before he even questioned the Defendant, that he was hanging out in a darkened, secluded, place—the porch of an abandoned house. To a reasonable person, the Defendant's choice to conduct his activities under the dark overhang of the porch instead of the sidewalk would appear suspicious. To an experienced police officer, it meant even more. Combined with Officer Thomas's knowledge of the recurrent criminal activity in that neighborhood and his experience that persons at abandoned houses were often engaged in such activity, the totality of circumstances led him to

suspect that the Defendant was engaged in criminal conduct. (Tr. at 46) (testifying that being on the porch of vacant house was suspicious activity); (Tr. at 50) (testifying that from his training and experience, when he determines that persons are at an abandoned property, he conducts further investigation); (Tr. at 47) (stating that high crime area where drug activity is common was factor he considered when he decided to frisk the Defendant). "[C]ourts may consider the defendant's presence in a high crime area as part of the totality of circumstances confronting the officer at the time of the stop." *United States v. Brown*, 188 F.3d 860, 865 (7th Cir.1999); *see also United States v. Jackson,* 300 F.3d 740, 746 (7th Cir. 2002) (holding that police may take into account whether a location is a "high crime area").

Officer Thomas acted on more than "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. He also acted on more than an anonymous tip. The anonymous tip prompted Officer Thomas to go to 2614 Reed Street, but it was not the sole or even the main basis for his investigation once he arrived there. Officer Thomas was justified, under the Fourth Amendment, in stopping the Defendant on the basis of his own observation of the situation. These observations led him to reasonably suspect that the Defendant was, or had been, engaged in criminal conduct.

**B. Pat-Down Search for Weapons**

When an individual is stopped by a police officer, this incident can potentially involve two stages: (1) the actual stop itself; and (2) a protective pat-down search. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). Such is the case here. The Court has already determined that the initial stop was justified because Officer Thomas had a reasonable suspicion supported by articulable facts that the Defendant may have been engaged in criminal activity. The Defendant argues that even

if the initial stop was justified, the pat down for weapons was not. The Defendant contends that Officer Thomas observed nothing that led him to believe that his safety or the safety of others was at risk.

Whenever the circumstances of an on-the-street encounter are such that a police officer reasonably believes he may be dealing with someone who is armed and dangerous, the officer is justified in conducting a pat-down search of that individual for weapons for his own protection, and for that of others nearby. *Terry*, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Addressing the objective aspect of the court's analysis, the Seventh Circuit has warned: "It is important to remember that we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." *United States v. Ford*, 333 F.3d 839, 843 (7th Cir. 2003) (citing *United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000)).

Officer Thomas had reasonable suspicion that the Defendant may have been involved in drug activity, given his location at an abandoned house in a high crime area. Officer Thomas's experience also told him that where there are drugs, there are firearms. (Tr. at 15.) When he questioned the Defendant and his friends, they gave no explanation for being on the porch. Officer Thomas ran warrant and criminal history checks on the computer in his car because he wanted to know as much as he could about the people he was dealing with, for his and the other officer's safety. (Tr. at 15.) Although a computer check of the Defendant did not reveal any warrants, it did alert Officer Thomas

8

that the Defendant's criminal history included drugs and firearms. The Defendant's criminal history contributed, appropriately, to Officer Thomas's belief that the Defendant could be armed. *See United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (finding that officers were appropriately concerned for their safety because of their knowledge that the defendant was armed in the past). Officer Thomas's concern for his own and Officer Springer's safety led him to leave his squad car before the check on Brandon Tucker was returned so that he could pat the Defendant's outer clothing for weapons.[2] Officer Thomas testified:

> Due to the information I obtained, looking at Jamarcus' and the other subjects' returns, especially Jamarcus, due to the fact he had firearms involvement, I didn't think it was wise to go much further and allowing them to stand out there knowing that the suspicious nature of the call, and some of the activities he's been involved in to leave an officer standing out there, leaving Officer Springer by himself to watch. I decided at that point just wanted to do a brief pat down for weapons on everybody.

(Tr. at 17.)

Officer Thomas acted as a prudent person would under the circumstances of the stop and was reasonable in believing that the Defendant posed a potential threat to him and Officer Springer. Perhaps telling of the caution with which officers patrolling in the area must proceed when conducting street investigations is Officer Thomas's account of people chasing him and Officer Springer and "yelling they were going to get us and everything" as they pursued the Defendant. (Tr. at 27.) Officer Springer's call for emergency assistance brought other officers to the area. Although Officer Thomas did not know that events would transpire requiring such assistance when he first

---

[2] It is not important that Officer Thomas frisked one of the other individuals before frisking the Defendant. The Fourth Amendment rights of the other individuals are not at issue, nor does it establish that Officer Thomas had any less concern that the Defendant had a weapon.

stopped the Defendant, he was familiar with the area and the kind of criminal activity that was common there.

**C. No Fourth Amendment Violation**

The totality of circumstances supports Officer Thomas's investigatory stop and his subsequent pat-down search for weapons. The Defendant's rights under the Fourth Amendment were not violated and the firearm and ammunition should not be suppressed. Additionally, the fruits of the poisonous tree doctrine does not apply to suppress the drugs found after his arrest or any statements the Defendant made after his arrest.

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Suppress [DE 23] is DENIED.

SO ORDERED on June 20, 2005.

                                         s/ Theresa L. Springmann
                                         THERESA L. SPRINGMANN
                                         UNITED STATES DISTRICT COURT